### UNITED STATES v. SACHER et al.

United States District Court
S. D. New York.

Oct. 14, 1949.
Judgment Affirmed April 5, 1950.

See also 9 F.R.D. 367.

MEDINA, District Judge.

In conformity with Rule 42(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., I hereby certify that the series of criminal contempts set forth below were committed in the actual presence of the Court and were seen or heard by the Court during the trial of the case of United States of America v. Foster et al., D.C., 9 F.R.D. 367, C 128–87, which commenced on January 17, 1949.

By way of preliminary, I may say that I would have overlooked or at most merely reprimanded counsel for conduct which appeared to be the result of the heat of controversy or of that zeal in the defense of a client or in one's own defense which might understandably have caused one to overstep the bounds of strict propriety. Before the trial had progressed very far, however, I was reluctantly forced to the conclusion that the acts and statements to which I am about to refer were the result of an agreement between these defendants, deliberately entered into in a cold and calculating manner, to do and say these things for the purpose of: (1) causing such delay and confusion as to make it impossible to go on with the trial; (2) provoking incidents which they intended would result in a mistrial; and (3) impairing my health so that the trial could not continue.

I find that the acts, statements and conduct of each of the defendants, hereinafter specified, constituted a deliberate and wilful attack upon the administration of justice, an attempt to sabotage the functioning of the federal judicial system, and misconduct of so grave a character as to make the mere imposition of fines a futile gesture and a wholly insufficient punishment. To maintain the dignity of the court and to preserve order in the court room, under these circumstances, was a task of the utmost difficulty. There was, accordingly, no alterna-

tive than to give the repeated warnings which from time to time I gave, and to postpone the impositions of sentence until the close of the case. To have done otherwise would inevitably have broken up the trial and thus served the ends which these defendants tried so hard to attain. As isolated quotations from or references to the transcript can give but a partial view of the acts, statements, and conduct above referred to, I hereby make the entire record part of these proceedings.

Accordingly, I adjudge the following guilty of the several criminal contempts described below:

| Defendant | Specifications |
|---|---|
| Harry Sacher | I, II, V, VI, VII, VIII, XII, XIV, XV, XVI, XVII, XVIII, XIX, XXV, XXVII, XXVIII, XXIX, XXX, XXXI, XXXIII, XXXVI, XXXVII, XXXIX. |
| Richard Gladstein | I, IV, VI, VIII, X, XI, XII, XIII, XVIII, XX, XXIII, XXIV XXVI, XXVII, XXXI, XXXII, XXXIV, XXXV. |
| George W. Crockett, Jr. | I, III, VII, XXI, XXII, XXVII, XXIX, XXXVII, XXXVIII. |
| Louis F. McCabe | I, VI, VII, VIII, IX, XXVII. |
| Abraham J. Isserman | I, VI, VII, XII, XXVII, XXXI, XXXII. |
| Eugene Dennis | I, XIX, XXII, XXXI, XL. |

I.

During the entire trial, Messrs. Sacher, Gladstein, Crockett, McCabe, and Isserman, attorneys and counsellors-at-law, and after March 17, 1949, Mr. Dennis, attorney pro se, joined in a wilful, deliberate, and concerted effort to delay and obstruct the trial of United States v. Foster et al., D.C., 9 F.R.D. 367, C 128–87, for the purpose of causing such disorder and confusion as would prevent a verdict by a jury on the issues raised by the indictment; and for the purpose of bringing the Court and the entire Federal judicial system into general discredit and disrepute, by endeavoring to divert the attention of the Court and jury from the serious charge against their clients of a conspiracy in substance to teach and advocate the overthrow of the Government of the United States by force and violence,

by attacking the Presiding Judge and all the Judges of this Court, the jury system in this District, the Department of Justice of the United States, the President of the United States, the police of New York City, and the public press of New York and other cities.

To effect this plan, these defendants in this proceeding, contemptuously and without justification:

a. Disregarded numerous warnings of the Court concerning their wilful delaying tactics, except for ironical references thereto;

b. Suggested that various findings by the Court were made for the purpose of newspaper headlines;

c. Insinuated that there was connivance between the Court and the United States Attorney;

d. Insisted on objecting one after another to rulings of the Court, despite a ruling on the first day of the trial, repeated several times thereafter, that all objections and exceptions would inure to the benefit of each of their clients unless disclaimed;

e. Persisted in making long, repetitious, and unsubstantial arguments, objections, and protests, working in shifts, accompanied by shouting, sneering, and snickering;

f. Urged one another on to badger the Court;

g. Repeatedly made charges against the Court of bias, prejudice, corruption, and partiality;

h. Made a succession of disrespectful, insolent, and sarcastic comments and remarks to the Court;

i. Disregarded repeatedly and flagrantly the orders of the Court not to argue without permission and to desist from further argument or comment;

j. Disregarded rulings on the admissibility of evidence so as to endeavor to place before the jury by leading questions the subject matter excluded;

k. Persisted in asking questions on excluded subject matters, knowing that objections would be sustained, to endeavor to create a false picture of bias and partiality on the part of the Court;

l. Accused the Court of racial prejudice without any foundation; and

m. Generally conducted themselves in a most provocative manner in an endeavor to call forth some intemperate or undignified response from the Court which could then be relied upon as a demonstration of the Court's unfitness to preside over the trial.

## II.

On January 21, 1949, during the hearing on defendants' challenge to the jury system, Herbert Allen, a member of the petit jury panel for the January Term of Court, was called as the first witness in support of the challenge. During his direct examination by Mr. Gladstein, Mr. Allen was asked for the assessed valuation of his home, to which question an objection was sustained. Thereafter, lengthy argument was directed to the Court by Messrs. Gladstein, McCabe, Isserman and Sacher, which was brought to a conclusion with Mr. Sacher shouting at the Court (Ch.Tr. 1390):

"Well, let me make one thing clear: your Honor said that you were going to conduct a hearing, and I tell you now if what you are going to do is to prevent us from asking these questions and proving the fact, then this hearing is no hearing; *it is just a sham and a pretense designed to prevent the establishment of those facts which will prove that the system is precisely what we say it is.*"

## III.

On February 2, 1949, during the challenge to the jury system, Harry Rosten, Research Manager for The New York Times, was being questioned by Mr. Isserman about Challenge Exhibit No. 20, already in evidence. Objection was made to the line of questioning being conducted by Mr. Isserman, and following argument, the Court sustained the objection. Thereupon, Mr. Gladstein and Mr. Sacher further argued the matter. They were followed by Mr. Crockett, who did not argue but limited himself to the insinuation quoted below (Ch.Tr. 2302):

"I have only one comment to make, your Honor. I have listened very carefully to the proceedings during the whole time

this was going on and what surprises me, frankly, your Honor, is the frequency with which Mr. McGohey will make an objection and the Court will sustain the objection without asking Mr. McGohey to state the reasons for his objection or giving us an opportunity to suggest to the Court the reasons why the objection should be overruled."

## IV.

On February 3, 1949, during the challenge to the jury system, defense counsel and the Court engaged in a discussion, in the course of which Mr. Gladstein in an insolent manner, said (Ch. Tr. 2461):

"Now, although everybody, one would think, who did not prejudge the matter here—"

and, after interruption, continued (Ch. Tr. 2463):

"Mr. Gladstein: Now, before the Court's interruption I was about to point out that what is important here is the question of your Honor's determinations upon the objections Mr. McGohey has raised, and sometimes even without him suggesting it—

"The Court: Yes, maybe I have a right to make a comment from the bench once in a while. It seems probably wrong to you and your colleagues, but it is commonly done, and I have no intention whatever of refraining.

"Mr. Gladstein: I wasn't referring to your Honor's comments, because they are always welcome. I was referring to the rulings that you make adverse to the defendants even before the United States Attorney opens his mouth to make an objection. That has happened."

After further colloquy, during which the Court invited a memorandum from Mr. Gladstein in respect to the admissibility of certain proof, Mr. Gladstein continued his reflection on the Court's integrity, as follows (Ch.Tr. 2466–2467):

"Mr. Gladstein: And it is not an easy task to research the authorities and present them to you on the question of the admissibility of this kind of data which is obtained by sampling methods. But if your Honor, *if there is any possibility of having the effect of those authorities respected* and

obtaining a reconsideration of the ruling that your Honor has taken, I will certainly do whatever I can to get that memorandum of law to the Court.

"The Court: I try to respect all authorities, those that are controlling and those that are persuasive. I try to do my duty as a Judge. I do not think it is very nice of you to put in that little insinuation, but I take it in good part. And so we will pass it.

"Mr. Gladstein: Very well. It isn't half of what I felt like saying, your Honor, as a result of what you said.

"The Court: Well, I can well believe that."

## V.

On the same afternoon, after hearing lengthy argument by Mr. Gladstein (Ch.Tr. 2483–2489), the Court sustained a Government objection to certain evidence proffered through the witness Wilkerson. After a recess granted at Mr. Sacher's request, Mr. Crockett and Mr. Sacher argued for a reconsideration of the ruling (Ch.Tr. 2490–2501). Continuing the attack of defense counsel upon the Court and completely ignoring the fact that the Court had heard Mr. Gladstein at length before ruling, Mr. Sacher loudly complained (Ch.Tr. 2494):

"I repeat, this is an Alice in Wonderland procedure. We always get the sentence first and then the trial. Now, if we would just get back to ordinary procedure with trial first and sentence afterwards, this might be a little bit more real—."

The Court directed Mr. Sacher to "completely refrain from further argument along this line" (Ch.Tr. 2494). Notwithstanding the direction of the Court, Mr. Sacher shortly returned to his attack upon the Court, as follows (Ch.Tr. 2500):

"Is it because the evidence is becoming too devastating for the Government that we must now be circumscribed? This is the telling stuff. Why are we stopped at this point when we proceed definitely to show that the Republican Party vote is the guide to the determination of how many jurors come from a district, and not that impartial selection which the Constitution and the statute require? That is what is at stake

in this instance, your Honor, and I submit I don't want to take any more of your time if we are doing nothing to influence you; I don't want to be like the Yankee in King Arthur's Court—."

## VI.

On February 4, 1949, during the challenge to the jury system and in the course of the direct examination of the witness Marcantonio by Mr. Isserman, the witness was asked to state how long certain low-rent housing projects had been in existence. The Court sustained an objection and told Mr. Isserman that it did not wish to hear argument from him. However, Mr. Isserman proceeded to argue and he was joined by Messrs. Gladstein, Sacher and McCabe. Repeatedly, the Court interrupted counsel stating that it did not desire to hear argument. Nevertheless, counsel continued (See Ch.Tr. 2544-2548). The Court then directed counsel to proceed with the interrogation of the witness (Ch.Tr. 2548). In the teeth of the direction, Mr. Gladstein continued. (Ch.Tr. 2548-2549), as follows:

"* * * since your Honor won't permit me to refer to the authorities, then I refer to a practical suggestion, and that is if instead of consuming time in arguing as to whether or not we have the right to make the simple statement for the record as to what the witness would say if he were permitted to answer the question to which the United States Attorney has objected, and which objection has been sustained—if instead of doing that we were simply allowed to follow the normal, usual routine procedure that takes place even before juries * * *"

Mr. Sacher then commenced speaking and the Court stated that it did not desire to hear him at that time (Ch.Tr. 2549). Despite this, Mr. Sacher continued (Ch.Tr. 2549-2550), as follows:

"But you have characterized my conduct as well as that of trial counsel, and I wish to deny it on the record, and I wish to say that your Honor is aware of the fact that there are 40 or 50 newspapers here, and on the threshold of Congressman Marcantonio's testimony you have taken occasion to say that his testimony is being introduced

for the purpose of dragging and delaying the trial; and I say—

"The Court: Did I say that?

"Mr. Sacher: Well, you imply that very broadly. If your Honor wishes to deny it I shall be glad to have the denial. But I got the impression very distinctly that your Honor's observation was made just on the threshold of the Congressman's testimony and that it was designed to color the effect and impression to be given to it, and I do not believe, your Honor, that that is appropriate.

"The Court: If you are only trying to provoke me, Mr. Sacher, you are wasting your time."

Shortly thereafter, Mr. McCabe concluded with the following statement (Ch.Tr. 2554):

"Yes, but I say that it seems to me that that is what is in your Honor's mind, and that also may very well be addressed to someone outside of this courtroom, and I think that the record, if reviewed by some other authority may indicate unusual degree of tolerance in the face of particularly annoying tactics, which I don't think we are guilty of."

## VII.

On the same day, while the witness Marcantonio was still being examined by Mr. Isserman, the witness was asked if he had found many persons residing in his Congressional District who were known to him to be of average intelligence. The Court sustained an objection. However, Mr. Isserman proceeded to argue the matter. Finally, the Court sought to close argument, directing Mr. Isserman to take his exception (Ch.Tr. 2621). Nevertheless, Mr. Isserman persisted (Ch.Tr. 2621-2622), as follows:

"Mr. Isserman: I was in the middle of my objection when your Honor interrupted to misconstrue a statement that I made. I said, conditionally—

"The Court: I wish you would not say that I do that, to misconstrue.

"Mr. Isserman: It seems to me to have been misconstrued.

"The Court: That seems an impertinent thing. Mr. Isserman, that seems an im-

pertinent thing. You are an experienced lawyer and you know better than to do that.

"Now, you lawyers have been at that here for three weeks, perhaps to provoke me—I don't know what the reason may be. But I do know that if you keep it up some day, perhaps now, perhaps hereafter there will be a time of reckoning. Now, please don't do that.

"Mr. Isserman: And I would like now to object to your Honor's characterization of my comment.

"Now, the statement that I was making —

"The Court: Well, when you charge me with deliberately misconstruing something I regard that as impertinence.

"Mr. Isserman: I did not say it was deliberate, your Honor. But I said it seemed to me to be that. But, in any event, what I was saying was this: I said if this were a small community the method of proof, as indicated by the cases, would be to call the persons directly involved. Your Honor has thus far conditionally ruled that your Honor would not allow the calling of those persons who would give the direct evidence on their status."

Mr. Isserman continued his argument and the Court again interrupted to remind Mr. Isserman of the Court's previous direction as follows (Ch.Tr. 2623–2624):

"The Court: Now, Mr. Isserman—

"Mr. Isserman: Now, the reason why—

"The Court: Let me say something to you. In every judicial proceeding that I am familiar with, and I have had a pretty large experience at the bar, when the Court indicated that it didn't want any more argument on a point the lawyer quietly desisted. If he chose to except he noted his exception and went on to something else. Here, perhaps in an endeavor to wear me out, which it is gradually doing, you keep that up, and you make the argument or arguments just as you are doing now. And I say, as I have said before, that that in my judgment is not the proper conduct of an attorney. It is extremely wearing on the Court in a trial of this kind. I suppose it will wind up by bringing me down. I hope

it won't. I may have the strength to go on, and I hope I shall. But I tell you—stop it.

"Mr. Isserman: I would like to take exception to your Honor's remark as an improper characterization of my conduct.

"I would like to state my—complete my objection for the record if I may.

"The Court: You insist on going ahead again, and all I can do, as I do not intend to make a rumpus about it, is to advise you again—please desist; and then, if you insist upon going on, why, you must take the consequences, whatever they may be.

"Mr. Isserman: May I state my objection for the record?

"The Court: You may not."

Instead of proceeding with the interrogation of the witness, Messrs. McCabe, Sacher and Crockett carried on the argument. The Court told Mr. McCabe that argument was unnecessary (Ch.Tr. 2625), and then Mr. Sacher, angrily shouting, offered his "observation" to the Court (Ch.Tr. 2626–2627). Mr. Crockett thereupon took up the argument and failed to desist until the Court warned him that his insistence on going on was in defiance of the Court's direction (Ch.Tr. 2632).

## VIII.

The jury challenge commenced on January 17, 1949. On February 11th the Court determined that counsel for the defendants had taken almost four weeks to put in evidence which could have been adduced in no more than three or four days (Ch.Tr. 3291) and accordingly the Court concluded that defense counsel had engaged in a "deliberate effort here to make a mockery of justice" (Ch.Tr. 3290). At the close of court on that day, the Court directed defense counsel to submit a statement showing what they proposed to prove in the remainder of the challenge and how they proposed to prove it (Ch.Tr. 3344–3345). The statement was submitted on February 14th (Ch.Tr. 3346) and was found insufficient (Ch.Tr. 3415). At this juncture, the Court in the exercise of its discretion as to the order of proof, refused to hear further testimony at that time on behalf of defendants in connection with their challenge to the jury system, and directed that

the Government proceed with its proof. Counsel for defendants vociferously objected and, in the course of argument, Mr. Sacher, in an insolent manner, said (Ch.Tr. 3420):

"Now, I must in all candor say, your Honor, that it is very difficult for us among the defense counsel to believe that the United States Attorney was caught unawares in the request or the direction which the Court made to him to proceed with his proof on an hour and a half's notice—."

Other counsel proceeded to object, which led the Court to remark that the way the hearing was conducted was such as he never thought he would see in a court of justice (Ch.Tr. 3433). Thereupon, Mr. McCabe in a sarcastic tone said (Ch.Tr. 3433):

"I will agree, your Honor, on that last point; the way this case has been conducted is one which I certainly hoped that I would never see in a court of justice.

"The Court: You mean the way it has been conducted by me, I take it.

"Mr. McCabe: I mean that exactly."

The Court stated (Ch.Tr. 3434):

"I have been subjected to every kind of vituperation here and you might just as well tell me how I am going to be reversed and all that. It remains to be seen what will be done by higher courts, and your telling me about that isn't going to affect my judgment. I am trying my best here to rule justly, to rule impartially, to protect the rights of these defendants despite the conduct of their counsel, and I shall continue to do that."

Mr. McCabe followed this with the statement (Ch.Tr. 3434):

"I rise simply to say—to except to your Honor's characterization that anything the defendants' attorneys have done is sabotage. Sabotage there has been, but as I say I think it has been a sabotage of the entire system of justice in this court, and I say that we are the only ones who seem to be interested in that."

Thereupon, Mr. Gladstein jumped to his feet and, angrily advancing toward the bench, he said in a truculent manner (Ch. Tr. 3434–3435):

"Well, now, may I ask your Honor this: does your Honor really mean that the record shall indicate that it is a protection of the rights of these defendants for your Honor to say when I offer a piece of evidence, 'Mr. Gladstein, that would be material, that would be relevant, that would help to prove your case, but I am not going to let you put it in evidence because I don't like the way you and your colleague lawyers have been behaving'?

"The Court: Did I say that?

"Mr. Gladstein: In effect, yes, because you have absolutely rejected and you have prevented me from introducing evidence —."

IX.

On February 18, 1949, during the defendants' challenge to the jury system, Mr. McCabe diverted the course of his argument to remark (Ch.Tr. 4116-4117):

"I would like to say to your Honor that I really have come to believe that the constant repetition by your Honor at intervals which are almost as regular as the tolling of Big Ben—and I mean nothing personal in the allusion—or the eruption of Old Faithful out in Yellowstone Park, or wherever it is—these come at stated periods. I think you can pick 11.20 and 3.20 when these statements come that we are delaying; we are doing nothing; your Honor has seen nothing in the record. I say, I don't want—

"The Court: What is the point of those times, of those particular times?

"Mr. McCabe: 11.30 I think is the deadline for the afternoon papers, your Honor, and I think around 3.20 is the deadline—."

The Court (Ch.Tr. 4117):

"Well, that is something I had no idea of, and I must say you have got an ingenious mind to suppose that something was said for such a purpose. I think you ought to be ashamed of yourself." See also Tr. 6980.

X.

On February 28, 1949, during the challenge to the jury system, Mr. Gladstein asked the Court to reconsider its ruling

with respect to a document which he had sought to have admitted into evidence. The Court adhered to its prior ruling and stated it did not desire to hear further argument (Ch.Tr. 4559). Mr. Gladstein refused to heed the direction of the Court, as follows (Ch.Tr. 4560-4562):

"Mr. Gladstein: But, your Honor, *upon the pretext that this is a confidential document,* the one that I am asking about, the one that was written by this witness, *you are preventing me from showing* without any question the final proof of the corruption of the system here in so far as they placed in charge of it a man who was the director of a dozen corporations, who—

"The Court: Mr. Gladstein—

"Mr. Gladstein: May I finish, Judge?

"The Court: I consider your language offensive and not fitting for an officer of this court to use when you speak of a ruling by the Court as done under a pretext, and use such other language as you used there. You must know that you are doing something that you should not do, and I direct you to desist.

"Mr. Gladstein: Your Honor, I ask that you consider the law that applies to this question because—

"The Court: I heard what you said.

"Mr. Gladstein: Do you refuse to have a memorandum of law submitted to you?

"The Court: And I consider the language offensive.

"Mr. Gladstein: Do you—

"The Court: And you know, you know that it is, but of course it may be pleasing to some of the people.

"Mr. Gladstein: Well, that is not—I have never said anything—

"The Court: But that is an additional reason why you should not do it.

"Mr. Gladstein: I have never said anything for the purposes of pleasing anyone here but for the purpose of trying to put in evidence and to persuade your Honor to do what I think the law requires.

"The Court: Well, you are not going to provoke me, so you might as well stop doing that.

"Mr. Gladstein: I want to make an offer of proof concerning this letter which, according to the witness' statement, is in this building and readily available and which, by the way, Mr. Duncan, it was called for in the subpoena that was served on you— isn't that so?

"The Court: I direct you not to make this one. It is already sufficiently evident in the case what the paper is and what your claims about it are, and mere repetition of it will only serve to use up your time that you can employ to better advantage.

"Mr. Gladstein: All right. Let the record show that it is a letter written in May 1942 by Mr. Duncan, the present witness, and let the record further show that I called for that letter, and for the letter or questionnaire in which it was a response, to which it was a response—

"The Court: Now Mr. Gladstein, you have again done what I have told you not to do.

"Mr. Gladstein: I want the record to show that I had the subpoena served on this witness. Can it not show that?

"The Court: I understand what you want, but the accumulation of these acts of disobedience to my rulings is something that concerns you, and I hope that you won't keep at it any more."

## XI.

On the same afternoon, shortly after the foregoing incident, Mr. Gladstein offered in evidence the 1949 edition of "Poor's Register of Directors," consisting of 3200 pages. The Court stated that it would hear Mr. Gladstein on the question of the relevancy of the exhibit. After hearing a statement from Mr. Gladstein, the Court sustained the objection to the book. Thereupon, Mr. Gladstein, in a sarcastic and impertinent manner, said (Ch.Tr. 4590):

"I thought when you heard the facts you would, Judge."

## XII.

On March 1, 1949, in the course of the cross-examination of the witness John Whittier Darr, Jr., the witness was asked by Government counsel how long he had been a member of American Youth for

Democracy. Mr. Gladstein objected to the question as incompetent, irrelevant and immaterial. The Court overruled the objection, but Mr. Gladstein continued to argue (Ch.Tr. 4781).

As soon as Mr. Gladstein finished, Mr. Sacher and Mr. Isserman interjected sarcastic comments, as follows (Ch.Tr. 4781):

"Mr. Sacher: May I respectfully say to your Honor that membership in the American Youth for Democracy has no more bearing on the credibility of this witness than the fact that Judge Knox is director of two of the biggest corporations in this country."

"Mr. Isserman: Or that your Honor is in the Social Register."

The Court again stated that it overruled the objection and directed the witness to answer the question, and said to the witness he should bear in mind that he should not make a speech as he had done a moment ago. Thereupon, Mr. Gladstein said (Ch. Tr. 4782):

"Let the record show my objection to the Court's gratuitous and improper characterization of the witness's testimony, as an effort to make a speech—."

## XIII.

On April 4, 1949, in the course of the cross-examination of the witness Budenz, the United States Attorney objected to a line of questioning by Mr. Gladstein, who was directed by the Court to turn to something else (Tr. 2296). Mr. Gladstein persisted in arguing the matter with the Court. The Court again directed Mr. Gladstein to turn to another subject and told him that when a lawyer persists in arguing about the same thing the only inference is that the lawyer is trying to leave the impression that the facts recited in questions asked by the lawyer and ruled out actually represent the truth. Mr. Gladstein thereupon made the following statement in the presence of the jury (Tr. 2297):

"They do represent the truth and I intend to show that they do. Let me put it this way—."

## XIV.

On April 5, 1949, during the cross-examination of the witness Louis F. Budenz, the following transpired (Tr. 2479-2480):

"Q. Can't you say certainly whether it was in August or not?

"Mr. McGohey: I object.

"The Court: Overruled.

"It is puzzling me as to what difference it made as to what date he made the speech but—

"Mr. Sacher: When this witness undertakes—

"The Court: Please don't argue. I allow the question.

"Mr. Sacher: When your Honor makes a provocative remark and your Honor says you don't know what difference it makes—

"The Court: I strike out your remark about my making a provocative remark. I did not make a provocative remark and I consider your response insolent. Now you please stop that. I am not in the habit of making provocative remarks. I am trying to do my best to administer justice.

"Mr. Sacher: And I am trying to defend my clients.

"The Court: I will not have insolence from the bar.

"Mr. Sacher: I am trying to do my best to defend my clients.

"The Court: You please refrain from further comment and frame your next question. I am used to having respect from the bar.

"Mr. Sacher: I wish to say to your Honor that I don't want to show you any disrespect.

"The Court: You reframe your question.

"Mr. Sacher: And you know it.

"The Court: Oh, yes, I know it. I sure do.

"Mr. Sacher: And I think it is a reciprocal objection. I think lawyers who are defending their clients for their liberty should not be treated as though they were dogs in the courtroom either.

"The Court: That is an insolent remark and I strike it out, the statement that you

have been treated like a dog. I don't see how you dare speak that way.

"If you can control yourself, please ask the next question.

"Mr. Sacher: I am trying, your Honor."

## XV.

During a session of the Court on April 7, 1949, while a Government witness was under direct examination, Government counsel invited the Court's attention to the fact that a Mr. Simon Gerson, who regularly had been seated at defense counsel's table, was circulating certain papers to representatives of the press in the courtroom, whereupon the following colloquy took place (Tr. 2750-2751):

"Mr. Gordon: I see Mr. Gerson passing out some papers to the press section, your Honor.

"Mr. Sacher: Now that is absolutely wrong, your Honor. I asked Mr. Gerson to be good enough to speak to someone for me. This is another instance of surveillance.

"The Court: Well, if Mr. Gerson is passing out press releases in the courtroom, please stop it.

"Mr. Sacher: Well, there are no press releases.

"The Court: All right. Then that settles it, that is the end of it.

"Mr. Sacher: But it is uncomfortable, your Honor, to be under observation. Can't we move freely in the courtroom without having our movements remarked upon?

"The Court: Well, if you haven't been moving freely in the courtroom, Mr. Sacher, then my eyes and ears have been deceiving me. (Mr. Gordon hands paper to the Court.)

"The Court: Now let us see what this paper is that Mr. Gordon produces. (After examining) Why, it is a press release,— doing just what you said was not being done.

"Mr. Sacher: I asked Mr. Gordon— Mr. Gerson to see someone for me on the outside, and it had nothing to do with press releases, your Honor.

"The Court: Well, I have in my hand a press release which it appears was just handed out by him and which you deny.

"Now I don't want to get into any collateral controversies here and we will just let it rest with this direction: I do not want any press releases handed around here in the courtroom or anything of that kind. Now this isn't a propaganda place here. This is a court of justice where people are in trial and I direct that no more of that be done."

The press release which was retained by the Court bears the pictures of the defendants and was captioned, as follows:

"Trial of the Twelve
401 Broadway—Room 1601–02
New York 13, N. Y.
Walker 5–2010
    Public Relations Office

For Release
April 7, 1949"

The records of the Clerk of the Court reflect that on January 17, 1949, Messrs. Sacher, Gladstein, Isserman, Crockett and McCabe notified the Clerk that for all purposes relating to any matter in the trial the address of each is 401 Broadway, Room 1602, New York 13, New York, and that the office telephone number is WAlker 5-2010, the same address and telephone number which appeared on the press release referred to above.

## XVI.

On April 19, 1949, in the course of the direct examination of the witness Charles Nicodemus, Mr. Gladstein objected to a question which had not yet been completed, whereupon the following transpired (Tr. 3649-3650):

"The Court: Well, it seems to me, Mr. Gordon, there is something in that. Why don't you ask him a question without covering the matter of the other testimony? Is there something you want to direct his attention to?

"Mr. Gordon: Yes, I want to ask him whether he had received any instructions.

"Mr. Sacher: I object to this, your Honor, because it is quite obvious—

"Mr. Gordon: Why does Mr. Sacher shout me down?

"Mr. Sacher: Oh, Mr. Sacher shouting this little boy down.

"The Court: Now, Mr. Sacher, you are getting back into your old form.

"Mr. Sacher: Your Honor, I have consistently been in this form and no observations from the bench will change that form.

"The Court: You never can tell what will happen.

"Mr. Sacher: With your Honor up there I suppose that is true.

"The Court: I might possibly get control of my courtroom. I think I shall."

## XVII.

On April 22, 1949, in the course of the direct examination of the witness Charles Nicodemus, the Court sustained an objection made by Mr. Gladstein to a question asked by Government counsel. Mr. Sacher then arose and asked the Court to admonish Government counsel not to ask questions which were leading. The Court pointed out that the objection had been sustained. Notwithstanding that Mr. Sacher already had stated the ground for his motion, Mr. Sacher then asked the Court whether he could say why he wanted the Court to rebuke Government counsel but the Court refused permission. Mr. Sacher then remarked in a sarcastic manner (Tr. 3680):

"I see, only Mr. Gordon and Mr. Nicodemus may speak."

## XVIII.

On April 22, 1949, during the cross-examination of the witness Charles Nicodemus, Mr. Sacher asked the witness if he had pleaded guilty to an indictment for carrying concealed weapons. The Court, expressly stating that it understood that counsel was bringing out a conviction of crime, permitted him to proceed with the examination on this subject. Mr. Sacher then knew, on the basis of the entries reflected on the certified copies of the judgments in his possession, that the witness had been found not guilty on two separate charges, but he did not disclose those facts

to the Court. Instead, he continued the cross-examination on this subject, knowing that the Court was permitting the line of examination on the theory that evidence concerning convictions for crime was being elicited. When Government counsel were permitted to examine the judgments and sought to inform the Court of the fact that the witness had been found not guilty, Mr. Sacher exerted every effort to prevent the disclosure of these facts to the Court (Tr. 3716-3723).

In the course of redirect examination of the witness, the Court reiterated that the judgments disclosed that the witness had been found not guilty (Tr. 3765-3766), whereupon the following occurred (Tr. 3767):

"Mr. Gladstein: And also, in connection with your Honor's statements that you will continue to tell the jury that the case in which Mr. Nicodemus was involved turned out as not guilty, would you be good enough to add, if you tell the jury that, that it was no doubt because Mr. Nicodemus was innocent that the Court imposed a sentence of $140?

"The Court: You see, Mr. Gladstein, it is the first experience I have ever had either at the bar or at the bench where counsel were so brazen, where again and again they argued over the Judge's shoulder to the jury in what seems to be a deliberate attempt to induce the jury or some member thereof to disregard the Court's instructions. I have heretofore had occasion to tell counsel that that is treading on dangerous ground, and I hope it will not be repeated."

## XIX.

On April 25, 1949, in the course of the cross-examination of the witness Garfield Herron by Mr. Gladstein, he offered a book in evidence, to which objection was made by the Government. After argument, the Court ruled that it would not admit the entire book but, if there were some portion of it that was relevant, the Court would allow that portion in evidence (Tr. 3928-3932). At this point, Mr. Sacher arose and argued that it was necessary to have the book in its entirety in evidence,

and he continued the argument until the Court directed him to desist (Tr. 3936). Immediately, Mr. Dennis arose and the Court stated to him that it did not desire any further argument, saying that further talk would not be for the purpose of persuading the Court in connection with his ruling, but for other purposes (Tr. 3937). Mr. Sacher thereupon arose and objected to the statement. The Court interrupted him, saying that he was not going to have the trial carried on for propaganda purposes. Mr. Sacher thereupon stated (Tr. 3937):

"I object to that. That is what the prosecution is doing. We are trying to prove the truth here and we are being estopped from proving the truth. That is what is happening."

Following this, Mr. Dennis arose and stated he would like to make a brief observation. The Court again stated that it did not desire to hear further argument (Tr. 3937-3938). Nevertheless, Mr. Dennis commenced to make a statement. The Court interrupted, asking Mr. Dennis if he realized the Court had directed counsel not to argue (Tr. 3938). Despite this, Mr. Dennis continued, and the following occurred (Tr. 3938-3940):

"Defendant Dennis: I would like to make one brief observation, your Honor, because this is not a small question. I would like to remind the Court that we eleven defendants are not charged—

"The Court: You realize I told you not to do this, don't you?

"Mr. Dennis: I understood I might make a brief observation.

"The Court: But you want to go on just the same. Now I don't think you are helping yourself by doing that, but that is your lookout.

"Defendant Dennis: I would, briefly, like to place the following cardinal question. We eleven defendants are not charged, as your Honor intimated, charged with conspiring directly or indirectly with attempting to or take any steps to overthrow our Government by force and violence. We are charged with an alleged conspiracy to organize the Communist Party, which the prosecution claims would advocate and teach the necessity and the duty to overthrow the U. S. Government by force and violence, and that is to say, we are charged with exercising our inalienable rights of free speech, free press and free assemblage, and—

"The Court: I suppose you are just daring me to do something to you now but I am not going to do it.

"You gentlemen may be just as disorderly, just as disobedient, just as disrespectful as you choose to be, and you will not goad me into doing something which may prove only a source of difficulty in the trial.

"Now I tell you again to stop."

Following the statement of the Court, Mr. Crockett arose and made an objection, and Mr. Dennis, who had remained on his feet, continued his statement, saying (Tr. 3940):

"And the final remark, your Honor, is that we defendants intend, as we are duty-bound to do, to show, really what we have advocated, what—."

At this point, the Court found it necessary to take an adjournment for five minutes, to prevent Mr. Dennis from continuing to flout its direction.

## XX.

On May 2, 1949, in the course of the cross-examination of the witness Angela Calomiris, the following transpired (Tr. 4471-4472):

"Q. Now you have said that in the 1947 course the first one of the subjects on which you studied at that course was capitalism and the class struggle, involving the nature of capitalism.

"Mr. Wallace: Objection.

"The Court: Sustained.

"Mr. Gladstein: That is preliminary to a question. I haven't asked a question yet, your Honor.

"The Court: All right.

"Mr. Gladstein: It gets so that even before I ask a question it is sustained, the objection to it.

"The Court: Now that I consider a distinct impertinence—

"Mr. Gladstein: I did not ask a question.

"The Court:—and just an accumulation of what you have been doing here. You say it gets so that the Court rules before you have asked a question, you intimate that I am so prejudiced here that I don't want to be fair and am not fair. Now you will please stop that. You are not helping yourself or your clients by doing it, I think."

### XXI.

On May 4, 1949, in the course of the direct examination of the witness Thomas Younglove, the Government offered an educational outline in evidence. This was near the close of the day's session, and Mr. Sacher requested a recess to afford defense counsel an opportunity to examine the exhibit. The Court asked if it would not be practical to go to some other subject, or if there were not some books which the witness would be called upon to identify. When Government counsel replied that he could not proceed to another subject, but that there were books that were to be identified, Mr. Sacher observed that if the validity of the introduction of any of the books depended upon the introduction of the proffered exhibit, he would feel bound to raise an objection.

The Court then stated that if certain books were to be identified, it could see no harm that could come to the defense. Thereupon, Mr. Crockett arose and objected to the Court's anticipation of the nature of additional proof that the Government might offer. Although the books mentioned by the Court were "Foundations of Leninism" and the "History of the Communist Party of the Soviet Union," both of which had been previously admitted into evidence and identified by numerous witnesses, he suggested that the Court was improperly familiar with the Government's evidence before it was adduced, as follows (Tr. 4826):

"I don't think it is customary for the Court to show such familiarity with the possible course—with proof that the Government might present. That is the gist of it."

### XXII.

On May 19, 1949, shortly after the luncheon recess, the Government rested its case and the Court set aside the balance of the day for the hearing of any motions the defense desired to make.

Instead of making their motions, defense counsel lengthily argued for an adjournment. During the argument, the following occurred (Tr. 6046-6048):

"Defendant Dennis: I rise, first of all, your Honor, to protest most vigorously against the outrageous and arbitrary ruling which you have just made.

"The Court: Which ruling is that?

"Defendant Dennis: The ruling in respect to denying the defense even a reasonable opportunity to present its motions and the grounds for the motions.

"The Court: You see, you are not familiar with these legal matters, Mr. Dennis.

"Defendant Dennis: I am familiar, your Honor, with a number of things on which I would like to speak very briefly.

"The Court: Well, go ahead. This is your time.

"Defendant Dennis: I must say, the first thing that must be noted in respect to directing counsel to conclude any arguments or proffer any motions by 4.30 this afternoon makes a mockery of justice, because, by this ruling and by the injunction that defense must produce its first witness by tomorrow morning, your Honor has stated, in effect, that irrespective of what motions we offer that you cannot be convinced that there is no prima facie case.

"The Court: Let me ask you a question—

"Defendant Dennis: And, moreover, that you have prejudged this case.

"The Court: Let me ask you a question: Do you conceive it possible that the proof in support of a given charge might be so clear that argument of its legal insufficiency might not be helpful? Does that strike you as possible as a theoretical concept?"

Subsequently the Court asked Mr. Dennis what, in his opinion, was lacking in the proof adduced by the Government necessary to sustain a charge. To this, Mr. Dennis replied (Tr. 6050):

"Your Honor, in respect to that, the first thing I would say is that we in the United States should never permit what is being perpetrated here, where you have a federal police interpretation of what we defendants think and believe in."

Thereafter, in the course of his argument, Mr. Dennis made the following comment (Tr. 6053–6054):

"And it is highly reminiscent in many respects of the Reichstag fire trial and of the efforts of reactionaries in this and other countries to outlaw the Communist Party as a prelude to trying to drag our nation along the path of war and facsism. And however much you may think or agree or disagree with this I would strongly urge as a matter of most elementary justice and not to deprive the defense of some of the remnants of due process of law that we should be afforded an opportunity of a few days at least to prepare our motions, our argumentation."

Following this last statement, Mr. Crockett arose and the following occurred (Tr. 6054):

"Mr. Crockett: If the Court please—

"The Court: Yes, Mr. Crockett.

"Mr. Crockett:—I assume perhaps correctly that it would be to no avail to ask the Court to grant a reasonable time to prepare—

"The Court: It would be without avail to ask me to give any time for the making of these motions. They are to be made this afternoon.

"Mr. Crockett: That is why I made the assumption.

"The Court: Well, you put that word 'reasonable' in there. I don't [think] the request for any time now is reasonable. That is why I denied the application.

"Mr. Crockett: I think, your Honor, that the defendants, as well as myself and other counsel began this trial with certain illusions that have been shattered because of the prejudicial actions of the Court."

When the Court suggested that Mr. Crockett should be more temperate, the following occurred (Tr. 6055):

"Mr. Crockett: I suggest that this latest ruling of the Court merely confirms all of the prejudicial rulings that have been made in the course of this trial. I suggest that during the course of this trial it has actually been possible and I have heard spectators making the Court's rulings before the Court himself made the ruling.

"The Court: It is very interesting.

"Mr. Crockett: Because the Court's bias was so obvious that it was possible—

"The Court: That is an insulting comment you are making, Mr. Crockett, a very insulting comment."

### XXIII.

On May 24, 1949, during the direct examination of the witness John Gates, which was conducted by Mr. Sacher, the Court sustained an objection made by the United States Attorney to a question asked of the witness, inquiring whether he ever had to pay the fine or serve the sentence imposed in connection with the witness' conviction on a certain charge. The Court cut off an attempted argument by Mr. Sacher in opposition to the ruling with the direction that it did not desire argument on the matter. Thereupon, Mr. Gladstein interjected a statement which (1) wilfully misstated the evidence by referring to the "conviction" of the witness Nicodemus in the presence of the jury when, in fact, he knew that Nicodemus had been found not guilty and that the Court had so ruled; (2) improperly characterized the Court's correction of the injustice to the witness Nicodemus; and (3) insinuated that the Court was guilty of impropriety and partiality in sustaining the objection. The incident was as follows (Tr. 6271–6272):

"Mr. Gladstein: May I interrupt, your Honor, to object to the Court's ruling that prevents the establishment by testimony of the ultimate outcome of this matter, and I submit that a strange contrast is afforded by the Court's insistence, for example, to

which we have no objection—but the Court's over-insistence on pursuing to its final conclusion the arrest and conviction of the witness Nicodemus, concerning which it would seem to me—

"The Court: You will please desist from further argument, Mr. Gladstein.

"Mr. Gladstein: Very well."

## XXIV.

On May 25, 1949, in the course of the direct examination of the witness John Gates, which was being conducted by Mr. Sacher, an article written by the witness in 1938 was offered in evidence. Objection was made by the United States Attorney, which objection was sustained by the Court. Thereupon, the following occurred (Tr. 6460–6462):

"Mr. Gladstein: Your Honor, may I ask that the Government be required to state the grounds for its objection to a document that this man wrote twelve years ago before he ever knew that there would be an indictment and when he expressed his political views on the very issues involved in this case? May I know what the legal ground is by which a man is prevented from showing his intentions, his state of mind—

"The Court: You remember my instruction about these arguments?

"Mr. Gladstein: I desire to ask the Court to require the Government to explode this mystery whereby with the mere words 'I object' they can shut off the right of a man to show—

"The Court: You may think that this matter of argument is helpful. It is certainly not helpful to me. Now you have requested, and you could have requested without those comments and that argument that the Government be required to state the grounds of its objection. That application is denied.

"Mr. Gladstein: Your Honor, we have been sitting here for months—

"The Court: Now please don't start this argument over again.

"Mr. Gladstein: May I—

"The Court: I have no desire to hear it. If you have some motion, make it. If you have some objection, state it and I will rule on it.

"Mr. Gladstein: Well, I do object to a ruling which prevents a man from summoning to his defense the deeds and the acts of his life committed long before there was any question about it—

"The Court: I do not really think, Mr. Gladstein, you have any right to proceed with that form of argumentative matter when I have forbidden it. Now you have already got a very substantial record of disobedience here. You may have an additional record now if you chose to go on.

"Mr. Gladstein: I have no desire to disobey the Court's admonitions.

"The Court: But you have.

"Mr. Gladstein: I do have a desire, your Honor, to bring before the jury the opening pages of the book—

"The Court: Well, I think, Mr. Gladstein, this sort of argument is the very sort of thing that you are not entitled to bring before the jury and I forbid it.

"Now as I said before, if you choose to pile up the record of these things against yourself, you may go on.

"Mr. Gladstein: I take exception to the Court's remarks.

"The Court: Otherwise you will sit down.

"Mr. Gladstein: I take exception to the Court's remarks.

"The Court: Very well."

## XXV.

On May 26, 1949, in the course of direct examination of the defendant John Gates by Mr. Sacher, objection was made to a question asked of the witness, and was sustained. Mr. Sacher then asked the Court for the theory upon which the objection was sustained. The Court replied that it did not desire argument. Mr. Gladstein arose and asked the Court to inquire of the United States Attorney as to what legal grounds the United States Attorney urged in support of his objection. The Court refused to do this. Mr. Sacher then put another question to the witness, to which objection was made and sustained. Mr. Sacher angrily stated (Tr. 6532):

"I don't think there is a soul in this courtroom who knows what the words 'Past sins must be paid for now' mean unless this witness is permitted to say what he was talking about.

"The Court: Now—

"Mr. Sacher: And what is the use of laying it before the jury?

"The Court: —you realize that your action now is deliberately contemptuous?

"Mr. Sacher: It is not deliberately contemptuous. I am just bewildered, your Honor.

"The Court: I have told you not to argue these matters, and I really am quite at a loss to understand why you so flagrantly and deliberately and persistently disobey my instruction. Probably it is because I don't shout at you but I don't like to do that."

### XXVI.

On June 2, 1949, in the course of the direct examination of the witness John Gates, which was being conducted by Mr. Sacher, a pamphlet written by William Z. Foster was offered in evidence, and objection by the United States Attorney was sustained by the Court. Thereupon, Mr. Gladstein moved that the Court strike out testimony of all Government witnesses dealing with the claim that the Communist Party or its members taught and advocated that force and violence should be used in the event that the United States became involved in a war. This motion was denied by the Court, but Mr. Gladstein continued his argument. The following then occurred (Tr. 6838):

"The Court: You know, Mr. Gladstein, that I have indicated my desire not to hear arguments unless I desire them.

"Mr. Gladstein: I do, your Honor, but I thought that that was limited simply to hearing argument. Now it seems to me, and I submit, that the Court is now making it plain that it no longer wishes to hear evidence from the defendants, and that began to be true when the defense began to put in its case."

### XXVII.

On June 3, 1949, in the course of the cross-examination of the defendant John Gates, he refused to answer a question after being directed to do so by the Court, and he was sentenced for contempt. Immediately upon the pronouncement of the judgment of contempt, Messrs. Gladstein, Sacher, Crockett, Isserman, and McCabe, and the remaining ten defendants, simultaneously arose in the courtroom. The defendant Henry Winston and the defendant Gus Hall, each taking several steps past the end of the counsel table and toward the bench, began in a disorderly and threatening manner to shout at the Court in loud, angry voices. They were adjudged guilty of contempt for their misconduct.

The situation at that time became so serious that it was necessary to send for additional Deputies Marshal, who were then in other courtrooms in the building, to assist in restoring order and to prevent any further incidents in the courtroom.

The Court suggested to Mr. Gladstein that it would be "prudent if the defendants resumed their seats." Mr. Gladstein rejected the Court's request, saying (Tr. 6975), "Well, your Honor, may I first have a ruling on the right of the witness to complete the record of his invocation of his rights under the Fifth Amendment," and continuing to argue thereafter. Mr. Gladstein did not instruct his clients or any of their co-defendants to take their seats, and the defendants gave no heed to the Court's direction. Messrs. Sacher and Isserman also made statements to the Court, but neither of them made any attempt to assist the Court in restoring order in the courtroom, nor did Messrs. Crockett and McCabe. After the defendant Dennis had made statements to the Court, he turned to his co-defendants and stated that he urged "upon my co-defendants that they at this time do not speak—they can act as they see fit. I urge them not to call for any provocation." (Tr. 6977). Only then did the ten co-defendants resume their seats in the courtroom, and order was restored.

### XXVIII.

On June 7, 1949, Mr. Sacher objected to a question asked by the United States Attorney during the cross-examination of the defendant John Gates. Despite the fact that the Court had frequently in the past direct-

ed counsel not to argue without leave, Mr. Sacher commenced arguing, saying (Tr. 7123):

"I should like to observe that the defendant is being tried—".

The Court interrupted him with the suggestion that he desist. Nevertheless, Mr. Sacher in a loud voice commenced to shout (Tr. 7123):

"Well, your Honor, I submit that—".

When the Court directed Mr. Sacher to stop shouting, Mr. Sacher said (Tr. 7123):

"I am not shouting and I resent the filling of the record with statements about my shouting when all I am doing is speaking vigorously, and that, I think, is part of the function of an advocate."

The Court commented that Mr. Sacher was one of the most vigorous speakers it had ever heard. Mr. Sacher continued to argue, saying (Tr. 7123–7124):

"That may be, but I say to your Honor that I resent this trying the defendant for things that came 15 years or 18 years ago, and I submit that what he is being tried for is what is charged in the indictment between the years April 1, 1945 and July 20, 1948, and I also wish to say to your Honor that I don't think—".

He finally subsided, but only when the Court advised him that he was proceeding in direct and wilful disobedience of the direction of the Court.

### XXIX.

On June 9, 1949, the defendant John Gates was asked on cross-examination whether he had ever been convicted of a crime. He commenced to shout, saying (Tr. 7363):

"I am not making a long explanation. Let me answer. I did testify on direct examination—why don't you read the transcript? This is repetitious. I testified on the direct examination as to what I was convicted of, and Mr. McGohey knows it very well—".

The United States Attorney then requested that the record show that the witness had been shouting when he made the last answer. Thereupon, Mr. Sacher stated (Tr. 7364):

"May the record show that the witness is being crucified unnecessarily with interrogations to which he has truthfully answered already."

When the Court directed that this remark of Mr. Sacher be stricken, Mr. Crockett arose and, in the presence of the jury, said (Tr. 7364):

"May the record show that this is the fifth day of the witness's imprisonment in jail."

The Court remarked that it would not be provoked into an answer the Court might later regret. Mr. Sacher than stated (Tr. 7364):

"I object to that. We are the ones who are being injured and we are not being permitted to complain of the injury that is being inflicted on us. I think in the present state of the record, your Honor, it ill becomes anybody here to claim any martyrdom."

### XXX.

On June 30, 1949, in the course of the cross-examination of the defendant Gilbert Green by the United States Attorney, he was interrogated concerning a series of false statements in an application which he had prepared. When pressed for an answer concerning one of the false statements, the witness became evasive. An objection by Mr. Isserman was overruled. Mr. Sacher, who did not represent the witness and who was not participating in the examination of him, arose and interjected, as an attempted diversion (Tr. 8895):

"I would like to quote the Court and say 'This is pretty small pickings.' "

### XXXI.

On August 1, 1949, the witness Yolanda Hall, called by the defense, was asked a question on cross-examination and then the following transpired (Tr. 11,031):

"Mr. Isserman: I object to that as argumentative. It is not based on the facts in evidence as testified by this witness.

"The Court: Mr. Isserman, do you remember my admonition, that when counsel objects, counsel is merely to state 'I object'? You have violated it several times this morning. Did you forget?

"Mr. Isserman: I am reminded of it now. It is a habit that goes back over 25 years. It is hard to give up that habit, which your Honor has undoubtedly engaged in yourself.

"The Court: Every time you do that your action is contemptuous and direct, I think, wilful and deliberate disobedience of my command.

"Mr. Isserman: I must object to your Honor's characterization of my conduct.

"The Court: I have heard counsel for the defense here again and again give various excuses, say they have forgotten or it was inadvertent, and I have warned them again and again. I now say that such conduct must be and I find it to be wilfully and deliberately done and contemptuous.

"Mr. Isserman: I must object to your Honor's finding.

"The Court: Very well."

Not much later, during the cross-examination of the same witness, at the same session of the Court, she refused to answer a question (Tr. 11,070). At this juncture, the following occurred (Tr. 11,071–11,073):

"The Court: Do you remember the oath you took when you were sworn as a witness?

"Mr. Isserman: I object to that question.

"The Witness: Yes.

"The Court: Overruled.

"Q. Now, before you—

"Mr. Gladstein: May I object to the Court's—the inference from the Court's statement?

"The Court: Your objection is noted. It is overruled.

"Mr. Gladstein: Because the Court's statement has nothing to do with that.

"The Court: I will hear no argument.

"Mr. Gladstein: I want to note my objection on the record.

"The Court: You have noted it. Sit down.

"Mr. Gladstein: I object to that and ask your Honor to admonition the jury—

"The Court: Will you sit down or must I call an officer to put you down? I will have no more interruptions on cross-examination. Your field day is over.

"Mr. Gladstein: I resent your Honor's remarks as—

"The Court: Mr. Marshal, will you please—all right, I see you sat down by yourself.

"Mr. Isserman: May I object to your Honor's remarks and ask for a mistrial on the basis of your Honor's remarks?

"The Court: Denied.

"Defendant Dennis: Your Honor—

"The Court: I want no argument, Mr. Dennis.

"Defendant Dennis: May I make an inquiry of the Court?

"The Court: You may.

"Defendant Dennis: I would like to know whether the ruling and remarks of the Court are directed to the defendants and counsel as to prejudice our case before the jury?

"The Court: They are not. I have heard enough from Mr. Gladstein. I have heard enough interruptions and suggestions to witnesses and so on, and I will have no more interruptions of cross-examination. Now, that it final and that is over for this trial.

"Mr. Sacher: I wish to object to your Honor's remarks as being wholly improper and unjustified, and designed to prejudice the jury against the defendants.

"The Court: Your motion is denied.

"Defendant Dennis: I just wish to state and very emphatically, your Honor, that for all intents and purposes the defendants are deprived of counsel and deprived of what is set forth in the Sixth Amendment to the Constitution."

## XXXII.

On August 3, 1949, during the direct examination of the witness Geraldyne Lightfoot by Mr. Isserman, she was asked a question to which the Government objected. The Court undertook to elicit the information sought by a direct question. In order to forestall an answer, Messrs.

412

Isserman and Gladstein provoked a disorderly disturbance and succeeded in preventing an answer to the question, as follows (Tr. 11,269–11,274):

"The Court: Mrs. Lightfoot, in this matter of the strategy of the workers, did you discuss the dictatorship of the proletariat, imperialism, and just and unjust wars, and things of that kind, or were they not mentioned?

"Mr. Isserman: I object to the question.

"The Court: Overruled.

"The Witness: Under topic 3—under topic C—

"The Court: You will answer that question yes or no or state that you cannot answer it.

"Mr. Gladstein: I object to the Court's tone and manner of badgering the witness.

"The Court: There is nothing about my tone, and you will please sit down.

"Mr. Gladstein: I desire to make an objection.

"The Court: Mr. marshal, will you just—(To the reporter) Read the question to the witness.

"We will have no more monkey business here.

"Mr. Gladstein: I object to the ruling.

"Mr. Isserman: I object to the Court's remark.

"The Court: You will sit down, Mr. Gladstein.

"Mr. Isserman: And I want to register an objection to the Court's ruling.

"The Court: Very well.

"Mr. Isserman: As prejudicial to the conduct of the case and to the defense and making the defense impossible.

"The Court: When I desire to ask a question, I am going to ask it. I am through with the interference of counsel.

"Now go ahead and read the question, Mr. Reporter.

"Mr. Isserman: May I ask the Court a question?

"The Court: You may not. (Question read.)

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"A. Under C I discussed—

"The Court: Mrs. Lightfoot, did you hear me tell you to answer that question, either that you did discuss those subjects or that you did not discuss those subjects? Now which was it? You did discuss them or you did not discuss them.

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"Mr. Gladstein: Your Honor—

"The Court: Overruled. I don't want to hear anything from you, Mr. Gladstein.

"The Witness: The way that the question was—I heard the question. It says—

"The Court: Then you will answer it the way I tell you to, Mrs. Lightfoot. Now did you discuss those subjects or did you not?

"The Witness: The question includes 'things of that kind,' and—

"The Court: Then I will take out 'things of that kind.'

"Did you—

"The Witness: May I hear the question?

"The Court: I will give it over again.

"Did you in that lecture discuss, when treating the subject of the Strategy of the Workers, the Dictatorship of the Proletariat, Imperialism, Just and Unjust Wars, or any of them?

"The Witness: Well, were they mentioned during the course of that discussion, is that what you are asking me?

"The Court: Well, I suppose that word 'discuss' has some peculiar meaning in the Communist Party—

"Mr. Isserman: I object to that characterization.

"The Court: I will reform my question.

"Did you mention to the class in that lecture the subject of the dictatorship of the proletariat?

"The Witness: I didn't mention it at that lecture—

"Mr. Isserman: Just a minute. First of all I wish to object to your Honor's question—

"The Court: Mr. Isserman, I am not going to have any interference here. Now you will just go over there and sit down and then you can say what you want to say afterwards.

"Now Mr. marshal, just escort Mr. Isserman over to the seat.

"Mr. Isserman: I would like to make an objection to your Honor's question. Am I allowed to do it?

"The Court: You have made it. Go back and sit down there. (The marshal escorts Mr. Isserman to the seat.) (Mr. Isserman rises.)

"Mr. Isserman: Well, I rise now to object to your Honor's question.

"The Court: Overruled. (Mr. Isserman is seated.)

"The Court: Now Mrs. Lightfoot, you will give me a direct and responsive answer to that question. In that lecture did you discuss the subject—did you mention the subject of the dictatorship of the proletariat?

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"Mr. Marshal, will you show Mr. Isserman to his seat?

"Mr. Isserman: May I not stand at this point?

"The Court: You will sit right down. I have had enough contemptuous conduct from you and I am not going to have any more.

"Mr. Isserman: I am not aware of any contemptuous conduct.

"The Court: Well, you will be aware, all right.

"Mr. Isserman: I would like to object to your Honor's remark and I move for a mistrial because your Honor has made the defense impossible.

"The Court: Mr. Marshal, get busy. (Mr. Isserman sits down.)

"The Court: (To witness) Now answer that question.

"Mr. Isserman: I object to that.

"The Court: Overruled.

"The Witness: The question—may I hear the question again now; after so much I do not remember it.

"The Court: The Reporter will read it—or I will ask you again:

"In that lecture did you mention the subject of the dictatorship of the proletariat?

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"A. In the beginning of that—

"The Court: All right, I sustain the objection to that question. We will have no more of it.

"Go ahead with your next question, Mr. Isserman."

Having successfully prevented the Court from getting an answer, Mr. Gladstein nevertheless than attacked the Court, as follows (Tr. 11,275-11,276):

"Mr. Gladstein: And that includes the badgering tone and the bullying and blustering tone towards the witness.

"The Court: Oh, there is nothing about my tone that is at all noisy or loud.

"Mr. Gladstein: No witness can retain composure and dignity under the attack which your Honor has just levied during the last half hour. I assign it as misconduct.

"The Court: I consider what you said as absolutely contemptuous, Mr. Gladstein. Now you can keep it up all you want but you do it against my orders (Mr. McGohey rises.)

"The Court: Yes, Mr. McGohey; do you desire to say something?

"Mr. McGohey: I desire to say that certainly your Honor's tone was not loud; there was nothing that I observed in the nature of badgering, and I suggest that now we be allowed to go on with the trial.

"The Court: Yes.

"Mr. Isserman: And I object to Mr. McGohey's remarks as not being in accord with the facts.

"Mr. Gladstein: I would like to say that they are directly contrary to the facts, and I am willing, if your Honor will per-

mit, to have a poll taken of the members of the jury and the people of the press and the people in attendance in this courtroom at this moment as to—

"The Court: Mr. Gladstein, you know earlier in this trial I found that no matter how much leeway I gave counsel they just tried to put the whole administration of justice into disrepute by just the sort of conduct that you are now indulging in, and I tell you now in the most emphatic way that I know, without raising my voice, that you are to desist from that. It is wholly improper, as you must know, to talk about having the people in the courtroom polled and having the jury polled as to whether a statement made by somebody is accurate or not. That is all right perhaps in some place but it is not right or proper in a courtroom, and you must know that, so please let the matter go on."

Order had scarcely been restored, when the Court sought to elicit certain information from the witness, which was called for by a question asked by Mr. Isserman. Again Messrs. Isserman and Gladstein successfully prevented the Court from obtaining an answer, as follows (Tr. 11,281–11,284):

"Q. At whose instance did you give that course? A. That was a course given—

"The Court: Why don't you just give the person's name? Who was it that told you to give that course?

"Mr. Gladstein: Well, your Honor, I object to that. It may not have been a person.

"The Court: Overruled.

"Mr. Gladstein: I don't think you should direct the witness that way.

"The Court: Read the question to the witness, please, Mr. Reporter, and see if we can stop this circumlocution. (Question read.)

"A. This course was given—

"The Court: Now, Mrs. Lightfoot, you are going to say at whose instance it was. That means giving the name.

"Mr. Isserman: I want to object to that question.

"Mr. Gladstein: I want to object to the Court making a direction to this witness and pointing his finger at the witness in an intimidating way. I assign that as misconduct, your Honor.

"The Court: Mr. Gladstein, you are perfectly wonderful the way you make these things up.

"Mr. Gladstein: I beg your pardon?

"The Court: Oh, you go ahead now.

"Mr. Gladstein: Does your Honor deny that you—

"Mr. McGohey: Oh, if the Court please, can't we get on with the trial and stop this nonsense?

"The Court: I raised my finger, and the rest of it is sheer imagination but done deliberately. I know what you are up to, Mr. Gladstein. You and your colleagues here are trying, and again and again have made positively false statements in the record for the purpose of making me appear to be biased and prejudiced and to do the wrong things, that I am not doing. However, I am not going to sit silently by and have you do that.

"Mr. Gladstein: I deny that part of your Honor's statement which charges me with making false statements.

"The Court: I happen to be in charge of this case and I happen to be in charge of this court.

"Mr. Gladstein: I know, your Honor, but I wish the record to show that I deny that part of your Honor's statement that charges me or my colleagues with any false statements, and I not only agree with but affirm that part of your Honor's statement which is to the effect that your Honor is biased and prejudiced.

"The Court: Did I say that? I say you said so very often, and at your table things seem to be unanimous on that subject. You have attacked me again and again and I suppose you will continue to do it.

"Now, go ahead, Mr. Isserman.

"Mr. Isserman: I join in Mr. Gladstein's denial and object to your Honor's remarks.

"The Court: Yes.

"Do you desire me to have the rest of the counsel give their views, too, Mr. Isserman?

"Defendant Dennis: Your Honor—

"The Court: You may add your bit, Mr. Dennis.

"Defendant Dennis: No. I arise to make a motion for a mistrial first on the basis of the hostile and belligerent and disrespectful attitude of the Court to this witness, which interferes with the testimony and the presentation of our case.

"The second part of my motion is in connection with the ruling of the Court which deprives all counsel frequently not only of stating the grounds of their objection, but even to rise to move an objection.

"And, thirdly, I must say that the motion for a mistrial should be granted because you have placed counsel and the defendants under surveillance of this Court, and the case is actually proceeding now in that way and proceeding by a marshal—in a martial atmosphere.

"The Court: Your motion is denied, Mr. Dennis.

"Defendant Dennis: For those and other reasons I move for a mistrial.

"The Court: The motion is denied.

"Go ahead, Mr. Isserman."

### XXXIII.

On August 5, 1949, shortly after the cross-examination of the witness Robert Manewitz by the United States Attorney began, he was asked when he had resumed activity in the Young Communist League. Thereupon, the following occurred (Tr. 11,577–11,578):

"Mr. Sacher: I object to this line of questioning.

"The Court: Overruled.

"Mr. Sacher: I was kept from—

"The Court: I will have no interruption of the cross-examination; that is over.

"Mr. Sacher: Even if it is justified?

"The Court: I do not desire argument from you, Mr. Sacher—nor impertinence either."

### XXXIV.

On August 10, 1949, in the course of the direct examination of the defendant Robert Thompson, the Court sustained an objection to a question asking the witness to define Marxism-Leninism. Mr. Gladstein then proceeded to argue against the Court's ruling despite the Court's direction that there should be no argument, as follows (Tr. 11,818–11,819):

"Mr. Gladstein: May I call your Honor's attention to the state of the record—

"The Court: No, I don't want to hear any argument about it.

"Mr. Gladstein: But, your Honor—

"The Court: I will hear what this witness directed to be taught, resolutions that he voted for setting up the schools and what was to be taught in the schools, and when the time comes, if it does, for him to testify what he taught and in particular schools, within certain limitations I will permit. I do not conceive the question before us to be one which makes that question relevant.

"Mr. Gladstein: Would your Honor notice that in the record your Honor permitted the witness Budenz to be asked precisely that question and to give an answer to it?

"The Court: You know, I just told you I didn't desire to hear argument but you wanted to get that point in and so again you have become contemptuous. Go ahead.

"Mr. Gladstein: May I ask the witness the very same question that Mr. McGohey asked, your Honor?

"The Court: I tell you, Mr. Gladstein, again, I do not desire to hear argument.

"Mr. Gladstein: I do not want to argue but I am asking permission—

"The Court: No, you are arguing, and you are again contemptuous."

### XXXV.

On August 26, 1949, during the direct examination of the witness Edward Strong, called by the defense, an objection was sustained to a question asked of the witness by Mr. Gladstein. The Court stated that it wanted no argument, and Mr. Gladstein then commented upon the ruling of the Court, in a private aside to the jury, as follows (Tr. 13,169):

"The Court: It is all right. I don't want argument, Mr. Gladstein.

"Mr. Gladstein: That is no—

"Mr. McGohey: What was that?

"Mr. Gladstein: I was talking to myself.

"Mr. McGohey: Were you talking to yourself or part of the jury?

"The Court: I did not hear what was said.

"Mr. McGohey: I heard.

"Mr. Gladstein: I am willing to say what I said.

"Mr. McGohey: Say it.

"The Court: What did you say?

"Mr. Gladstein: Your Honor is asking me and I am replying because your Honor asked, and not because Mr. McGohey directed. Your Honor said you did not want any argument, and I said under my breath, 'Well, that is no secret.'

"The Court: I think that is an extremely improper thing for you to do, and to do as you are leaning right on the rail of the jurybox there, and I admonish you not to do that again."

### XXXVI.

On August 29, 1949, during the direct examination of the defense witness Max Weiss, Mr. Isserman sought to elicit testimony concerning the disaffiliation by the Communist Party from the Communist International. When the Government objected, the Court heard argument by Mr. Isserman and by the United States Attorney and then overruled the Government's objection (Tr. 13,334–13,337). After some testimony on the subject, the Court sustained an objection to a question concerning a statement at a convention, and Mr. Sacher interjected himself and implied a partiality in the Court's rulings in permitting argument.

In doing so, he again persisted in arguing despite the Court's express statement that it would not hear him (Tr. 13,338):

"Q. Either at the National Committee meeting which you attended in 1940 or the convention you attended in 1940, was there any statement made by anyone that the decision to disaffiliate was one that was a Comintern decision?

"Mr. McGohey: Objection.

"The Court: Sustained.

"Mr. Sacher: May I be heard on that, your Honor?

"The Court: No.

"Mr. Sacher: In view of that fact that Mr. McGohey—

"The Court: I will not hear you.

"Mr. Sacher: But Mr. McGohey was permitted to make a statement concerning this.

"The Court: Mr. McGohey responded to a question from me and further asked leave to address the Court which I permitted. I do not desire to hear you.

"Mr. Sacher: I have asked your Honor for leave.

"The Court: Please be silent, Mr. Sacher. Again you are deliberately contemptuous.

"Mr. Sacher: I am asking an opportunity to reply to Mr. McGohey.

"The Court: Go ahead, Mr. Isserman."

### XXXVII.

On September 9, 1949, during the direct examination of the defendant Carl Winter, Mr. Crockett asked him a question concerning the Black Legion, to which objection was made. The Court sustained the objection and at the same time stated that it did not want argument. Nevertheless, the following occurred (Tr. 13,893-13,894):

"Mr. Crockett: May I point out—

"The Court: I don't want further argument.

"Mr. Crockett: I wanted to say—

"The Court: I think you are in contempt now. Don't do it. I will not have any more. The time for that is over.

"Mr. Sacher: I wish to object to your Honor's characterization of Mr. Crockett's conduct as contempt.

"The Court: You may object. You have done enough of it yourself.

"Mr. Sacher: I wish to object to that characterization. I think the record will prove, I think, your Honor has sought to prejudice this jury sufficiently against counsel.

"The Court: You are deliberately contemptuous again.

"Mr. Sacher: I am not. I wish to defend the rights of my clients and the right to advocate their cause and I resent the constant obstruction of that effort on the part of the Court.

"The Court: There has been no obstruction of effort, but I will have order by the attorneys here, and I will enforce it with every power at my disposal.

"Mr. Crockett: May I ask if the Court is suggesting there has been any disorder by the attorneys?

"The Court: You insisted upon continuing arguing only a moment ago and I told you to stop.

"Mr. Crockett: I was not arguing.

"The Court: That is what you now say but everytime you said it you kept it up. Let us stop now and go on with the questions."

## XXXVIII.

On September 14, 1949, in the course of the cross-examination of the defendant Carl Winter, the Government offered a certified photostatic copy of a birth certificate in evidence, to which Mr. Crockett objected. The Court granted leave to him to state the grounds of his objection. However, in place of stating legal grounds for his objection, he argued, as follows (Tr. 14,219-14,220):

"Mr. Crockett: First, I submit that there is an invasion of the family relationship. This refers to a situation which has no relation whatever, and certainly should not be submitted in this court. Certainly I think it is apparent from the exhibit itself that my client's signature appears nowhere on it. There is nothing on that or the original, and I submit that it is taking unfair advantage of a man to show him what—

"The Court: Are you making a legal argument or a speech that we have had here so often?

"Mr. Crockett: Under the circumstances I decline to state any further grounds. There is no point in talking to a Court, when I would like to state the grounds, when it is apparent that his Honor's mind is closed to any grounds that I might state."

Thereupon, the Court ruled that only a portion of the exhibit was relevant and said (Tr.14,222):

"I shall receive the name and the address, and so that there may be no misunderstanding about them I shall read into the record, rather than permitting the exhibit to be handed around to the jury, the following: 'Father of the child, full name, Carl Winter. Color or race, Caucasian. Age at time of this birth, 35. Length of residence in California, zero years, three months, zero days. Birth place, Pennsylvania. Usual occupation, lecturer. Industry or business: self.' "

At this point Mr. Sacher said (Tr. 14,222-14,223):

"Mr. Sacher: May I call your Honor's attention to the fact that you indicated there were just three items, and that Mr. McGohey limited it to three items? You have read about six now.

"The Witness: May I say, your Honor—

"Mr. Sacher: Just the name and address, as I recall it.

"The Witness: May I address the Court?

"Mr. Sacher: Name, address, and date.

"Mr. Crockett: If the Court please—

"The Court: Is this additional part that I read very objectionable to you?"

At this juncture, Mr. Crockett made a statement which, by its sarcastic emphasis on the word "seemingly," accused the Court of intentionally reading more of the exhibit than should have been read, as follows (Tr. 14,223):

"Mr. Crockett: If the Court please, in view of your Honor's seemingly unintentional reading more than—

"The Court: Mr. Crockett, that is one of the most contemptuous things that has occurred at this trial.

"Mr. Crockett: I am trying—

"The Court: And for that you will be brought to justice.

"Mr. Crockett: I am trying to say, with the Court's permission—

"The Court: You just bear that in mind, Mr. Crockett.

"Mr. Crockett: Your Honor, May I—

"The Court: You say I seemingly do something and accuse me of deliberately evil motives here. That is something that I cannot pass over and I shall not. I now adjudge you in contempt for that."

### XXXIX.

At the same session of the Court, the following occurred during the cross-examination of the defendant Carl Winter concerning his use of an alias (Tr. 14,240-14,241):

"Q. Now I show you what purports to be the Los Angeles Extended Area Telephone Directory of March 1943, issued by the Southern California Telephone Company and I direct your attention to page 202—

"Mr. Sacher: Just a moment. I object to that question.

"The Court: Overruled.

"Mr. Sacher: I would like to be heard if I may.

"The Court: I don't desire to hear you, Mr. Sacher.

"Mr. Sacher: Will there come a day, your Honor, when you will hear us?"

### XL.

On October 4, 1949, the day after the Court had filed an opinion denying the request of the defendant Benjamin J. Davis, Jr., to discharge Mr. Sacher as his counsel, lengthy argument was made by Mr. Davis, Mr. Sacher, Mr. Isserman, Mr. McCabe, Mr. Crockett, Mr. Gladstein, and Mr. Dennis, that the Court reconsider its ruling. Immediately following the statement that the Court adhered to its ruling, Mr. Dennis moved for a mistrial. In stating the grounds Mr. Dennis, without any foundation, accused the Court of racial bias, saying (Tr. 15,293-15,294):

"In the light of the fact that the Court has recognized my inalienable constitutional rights and granted me, a white Communist, a defendant, who is not a lawyer, the right to conduct my own defense, its denial of this right to Mr. Davis, a Negro Com-

munist, a defendant who happens to be a lawyer, can only be construed as an act of gross discrimination and an affront to the Negro people."